Mr. Chief Justice Shaükey
delivered the opinion of the court.
The object of the bill in this case was to vacate a sale of certain slaves mentioned in the bill, of which respondent, who is appellant in this court, was the purchaser at a sale made by the sheriff.
The record is very long, but a very brief summary of the important facts will show the grounds on which the decision must rest.
On the 21st of February, 1839, Bartee loaned to one S. M. Turner the sum of $ 1500, and took a deed of trust on two town lots as a security. On the 11th of May following, Turner also conveyed to Bartee the slaves in controversy, and received, as it is alleged, other sums of money, and Bartee also agreed to pay a debt which was secured by a prior deed of trust. The bill of sale of the slaves was absolute on its face, though it is admitted to have been intended as a mortgage. This conveyance was accompanied by possession, and was intended as a further security for the original loan. Turner failed to pay, and by his consent the slaves were sold at public sale, and Bar-tee became the purchaser.
On the 6th of October, 1841, a judgment was rendered against Turner in favor of one David Reinhardt, for upwards of $5000, on a writing obligatory dated as far back as the 21st of March, 1824, payable the 1st of January, 1825. This suit was brought in Lowndes county, although Turner resided in Octibbeha county, and the judgment was taken by default. An execution issued on this judgment, which was levied on the slaves in the hands of Bartee, who claimed them as his property. *294 An issue was made up to try the right, when Turner was introduced as a wiiness, and on stating that he was disinterested, was permitted to testify. He stated that the bill of sale to Bar-tee was made to defraud creditors, and the jury found in favor of the plaintiff in execution. The property was delivered up and sold under the Reinhardt judgment, though prior to the sale other executions had been placed in the hands of the sheriff. Humphries purchased the slaves at about half their value. He claims to be the assignee of the Reinhardt judgment. The note on which it is founded, was sent to him by mail for collection by one Billingsley, and he afterwards purchased the judgment from an individual, who professed to be an agent of the person who had sent the note for collection. This judgment constitutes the groundwork of this whole proceeding. The bill alleges that it was recovered by fraud and collusion between Turner and Humphries, on a note forged for the purpose, with a view of taking the slaves from complainant. Reinhardt is made a party to the bill, and his testimony was also taken. He positively disclaims ownership of such a note, or knowledge of the transaction, and says Turner never owed him that amount of money. He it seems resided in Lincoln county, North Carolina, at the date of the note, and had resided there many years, both before and afterwards,- but now lives in Florida. He had known Turner when he was a young man, and had, as a merchant, some dealings with him, but never to the extent of the note. In addition to this testimony, Turner’s declarations as to his purpose, were also in proof. The scheme was no doubt concocted for the purpose mentioned in the bill. This judgment is beyond all doubt fraudulent, and it is enough to say of it that it is a nullity, and all the proceedings under it are of the same character. No execution predicated on it could operate to pass a title to Humphries, who claims to be the owner of the judgment, and is, to say the least, chargeable with notice of the fraudulent character of the transaction.
In the answer of Humphries, the judgment on the trial of the right of property is relied on as a bar to the relief sought. We *295 have said the original judgment was void for fraud. The subsequent proceeding was equally so. When a court of equity is resorted to for the purpose of letting the party into a defence which is, in its character, triable at law, he will be held to strict vigilance. By an amended bill it is alleged that complainant had not obtained information as to the nature of the Reinhardt judgment, until after the trial at law. In July, 1843, he received the first information as to Reinhardt’s residence, and his informant assured him that he was satisfied, from his acquaintance with both Reinhardt and Turner, that the latter could not have owed to the former any such debt. He then opened a correspondence with Reinhardt, and did not become fully informed on the subject until after he had filed the original bill. The circumstances of this case are peculiar. A note was forged bearing date nearly twenty years before the judgment was rendered on it. It was payable to a stranger, who was a citizen of another state, whose residence was likely to be unknown. But even if it should be found out where he had lived, he had changed his residence to a distant state. The great wonder is that the scheme was discovered at all. Under the circumstances, it would be difficult to say, what was or what was not proper vigilance.
But this case differs from those in which the rule of vigilance is usually applied. The complainant is affected by a judgment to which he was not a party. His proper remedy for avoiding it was in chancery. It is a subject over which chancery has original jurisdiction. The complainant might have proceeded by bill for that purpose, before the trial of the right of property. A stranger to a judgment may always show that it was recovered by fraud. 1 Starkie’s Ev. 241; 1 Phillips’s Ev. 341; 3 Ib. (C. & H.) 854. Has a court of chancery lost its power to interpose? Surely not, when the judgment is void. No relief can be had against a void contract, when the defence ought to have been made at law; but if the judgment itself be void, it is a different question. Hence, on gaming contracts, chancery will give relief, because the judgment is void, although the defence might have been made at law. If the contract be *296 void, and the party fails to make his defence at law, the judgment is valid, and chancery will not interfere with it. But this judgment was void by the common law, and also by statute. It derives no validity from the failure to make the defence on the trial of the right of property. The original judgment was relied on as binding the property, but it was void, and may be set aside by a court of chancery. 1 Story’s Eq. 275, § 252. It is true that Bartee might have pleaded, on the trial, of the right of property, that the judgment was fraudulent. But his failure to do so, does not make it valid. His want of vigilance has not imparted validity to the judgment, and the rule therefore does not apply.
But there are other judgment-creditors, whose rights are not to be overlooked. The bill of sale was made 11th of May, 1839. It was to operate as a mortgage. There is no doubt about the loan of $1500; that is admitted by all. The judgment in favor of Owens was rendered 9th of April, 1839, and is therefore a lien on all the negroes except Kitty, she having been previously conveyed in trust to secure a debt due to Blount. The other judgments were rendered after the bill of sale, and could bind nothing but Turner’s right to redeem.
The case must be remanded for an account, and the rights of the parties will be regulated and allowed, according to the following directions. Bartee alleges that he paid a debt to Blount, who held a deed of trust on the woman Kitty, and took a transfer. If this be so, it constitutes a prior lien on the property included in that deed of trust, inasmuch as it bears date in August, 1838. By this arrangement Bartee was substituted to the rights of Blount.
2. Bartee is entitled to be allowed the $1500, and the other sums which he may prove to have been paid as a consideration for the conveyance of the negroes. Humphries is also to account for hire for the time he has had the negroes in possession, and Bartee is of course to be charged with what he has received.
3. Any surplus that may remain is to be appropriated to the judgment-creditors, in their order of priority, excluding, how *297 ever, such judgments as were not recorded in the proper county according to the statute. Or Bartee may redeem from these creditors.
4. In order to adjust these rights the negroes will be sold.
The vice-chancellor decreed the judgments to he a lien on the property, on the ground that the bill of sale, which was to operate as a mortgage, had not been recorded. In Dey v. Dunham, 2 Johns. Ch. R. 182, a deed absolute on its face, was converted into a mortgage by a subsequent defeasance in writing, and it was held that the subsequent agreement should have been registered as a mortgage, and that the registry of the absolute deed was not sufficient, because, as it was said, a subsequent purchaser was not bound to search the record of deeds to be protected against the operation of a mortgage. But here there was nothing to record. It is an equitable mortgage, an absolute instrument which equity converts into a mortgage, and equity will not so convert it to the prejudice of the grantee. The general rule is, that the instrument which gives rise to an equitable mortgage must be registered, if it be not an actual conveyance, but merely an instrument which raises an equitable mortgage. 2 Powell on Mort. 621, note. A bill of sale need not be recorded, and any parol agreement in relation to it cannot be. In the case cited from 2 Johnson, the possession probably remained with the grantor. Bartee took possession of the negroes, and no other conveyance was necessary to pass title. This was equivalent to notice.
Decree reversed, and cause remanded.